IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

Plaintiff,

vs.

MARATHON INVESTMENT PARTNERS L.P.,

Defendant

Civ. A. No. 05-10255-MEL

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF AND APPOINTMENT OF RECEIVER**

INTRODUCTION

The government's motion seeks to put the defendant, Marathon Investment Partners, L.P. ("MIP"), a small business investment company, into receivership on the grounds that MIP is in a state of "capital impairment," as that term is defined in the regulations of the Small Business Administration ("the SBA"). In the circumstances of this case, the appointment of a receiver and entry of an injunction would be inequitable and harmful to innocent third parties; further, such remedies would substantially impair the value of MIP's portfolio and diminish the recovery eventually available to all interested parties, including the government itself. Moreover, it is clear that the government has delayed for years, and the nature of its delay makes the relief it seeks inequitable. Finally, the government's motion rests on a procedural mistake. The government seeks final rather than preliminary relief, and it does not purport to make the showing required for a preliminary injunction. But final relief comes after judgment, not at the outset of the case; the government is attempting to deprive MIP of the opportunity to conduct discovery and otherwise to challenge its case.

In this case, unlike in the cases the government cites in its brief, the government does not allege that MIP's managers engaged in any misconduct. Nor does the government question the competence and diligence of MIP's managers in the administration of the portfolio. The Court, especially in an equitable proceeding, need not and should not grant the remedies the government seeks here, where the harm to all parties substantially outweighs any benefit a receiver could offer. Accordingly, the government's motion should be denied.

## FACTS

### A. Background

MIP is a Delaware limited partnership organized in 1998. It is licensed by the SBA as a small business investment company under § 301(c) of the Small Business Investment Act of 1958, as amended, 15 U.S.C. § 681(c) ("the Act"). (Lee Decl. ¶ 5).[1] MIP's general partner is Marathon Investment Partners GP, LLC ("MIPGP"), and Marathon Investment Management, LLC ("MIM") is its management company. (Lee Decl. ¶ 1).

MIP obtained capital commitments of $17.1 million, of which $10.5 million was from institutional investors, $5.5 million was from individual investors or entities controlled by individuals, and $1.1 million was from MIP's general partner, Marathon Investment Partners GP, LLC ("MIPGP"). MIP made capital calls for all but approximately $2.34 million of the capital commitments between 1998 and 2001. (Lee Decl. ¶¶ 6-8).

Consistent with the purposes of the Act, MIP has invested in a series of small companies. It currently has debt or equity investments in seven companies. Two of these companies are in Chapter 11 proceedings, and thus for present purposes, MIP's active portfolio involves five small businesses. (Lee Decl. ¶ 9).

---

[1] The Declaration of Thomas F. Lee is being filed herewith.

B. MIP's Involvement With Its Portfolio Companies.

MIP has not simply invested in these five firms. It has actively advised and assisted them by, for example, introducing them to potential investors, assisting them in refinancing or restructuring their debts, introducing them to experienced managers, and assisting them in turnarounds. MIP's principals have served as directors of the portfolio companies and have detailed and intimate knowledge of their businesses. While some of the portfolio companies have experienced volatile results in the past several years, MIP's expectation is that all of them will be in a position to buy out some or all of MIP's stake in 2005 or 2006. (Lee Decl. ¶¶ 10-24; Lusso Decl. ¶¶ 6-27).[2]

MIP's involvement with each of the portfolio companies is set out more fully in the Declaration of Thomas F. Lee and the Declaration of Clifford J. Lusso, both of which are being filed herewith. A representative example involves Spencer Technologies, Inc., a portfolio business that designs, configures, and installs telecommunications and data networking equipment. (Lusso Decl. ¶ 17). Clifford Lusso, one of the managers of MIP's management company, serves actively on Spencer's board of directors and advises its management. (Lusso Decl. ¶ 19). He has guided Spencer through several rounds of negotiations with its former senior lender, Fleet Bank, that led to stabilization of the company's finances. (Lusso Decl. ¶¶ 21-22). After Spencer called off a merger, on Mr. Lusso's advice, Mr. Lusso assisted Spencer in refinancing its senior debt by introducing Spencer to Webster Bank, which became its senior lender. (Lusso Decl. ¶ 23). Mr. Lusso and MIP have also helped Spencer in making necessary management changes by, for example, introducing Spencer to the experienced businessman who was to become its new CFO, and who since beginning work in early 2004 has significantly

[2] The Declaration of Clifford J. Lusso is being filed herewith.

controlled Spencer's expenses and managed its cash flow. (Lusso Decl. ¶ 24). MIP is presently assisting Spencer in raising additional capital by, for example, introducing Spencer to potential investors, helping to prepare the package of information Spencer distributed to the potential investors, and providing general investment advice. (Lusso Decl. ¶ 25). MIP's advice to Spencer has been particularly important because Spencer's manager is young and relatively inexperienced. (Lusso Decl. ¶ 26).

C. MIP's Dealings With the SBA

MIP has been in a state of capital impairment since 2000. (Lee Decl. ¶ 25). In September 2000, the SBA, in response to an inquiry from MIP, acknowledged that other SBIC's had been in a similar situation, and stating that the SBA's practice in such cases was to require management to provide expected results for the next few years. (Lee Decl. ¶ 26). The SBA did not, in this communication, mention receivership, injunctive relief, or any of the remedies it seeks now.

Several months later, the SBA told MIP that it was considering sending a default letter on account of MIP's capital impairment. (Lee Decl. ¶ 27). It did not then, however, send the letter. (Id.) In March 2001, MIP provided the SBA with updated operating plans which the SBA rejected. At the time it rejected the plans, the SBA notified MIP that it was in default under the capital impairment regulations and demanded that MIP cure the default by June 30, 2001. (Lee Decl. ¶¶ 28-29). The SBA extended the deadline to cure to July 16, 2001, but ultimately it did not follow through on its threat, and MIP remained capitally impaired. (Lee Decl. ¶¶ 29-31).

In March 2002, MIP requested that the SBA waive the capital impairment requirements. Thereafter, the SBA and MIP held a meeting in Washington on May 7, 2002. At the meeting, the SBA agreed that MIP had a "viable plan for repaying the SBA's Debenture Leverage." Accordingly, the SBA and MIP agreed to a three-point plan: (1) MIP's current management

would continue to operate MIP, with the goal of liquidating the remaining portfolio holdings, and MIP would not make new investments without the SBA's prior approval; (2) MIP would reduce its management and advisory fee to $500,000 per year for fiscal years 2002 and 2003; and (3) MIP agreed that "If [it] realizes any settlement related to the Lids lawsuit, the entire proceeds will be directed to pay off the Licensee's existing SBA Debentures." (Lee Decl. ¶¶ 32-33).[3]

In August 2002, the Bankruptcy Court issued an unfavorable opinion in the Lids case, and as a result, MIP has not recovered anything from the Lids bankruptcy. (Lee Decl. ¶ 35). Nevertheless, the SBA did not impose any sanction on MIP after the Lids decision. (Lee Decl. ¶ 36). Indeed, at a meeting on August 27, 2003, the SBA agreed that MIP's management could continue to operate MIP under the terms of the three-point plan. (Lee Decl. ¶ 37).

Almost one year later, in May 2004, the SBA again notified MIP that it was in default under the capital impairment provisions and demanded that MIP cure the default within fifteen days. (Lee Decl. ¶ 38). More than three months later, MIP had not cured the default. (Lee Decl. ¶ 39). At that point, the SBA notified MIP that it was accelerating the debentures and demanded payment within fifteen days. (Lee Decl. ¶ 39).

At a meeting in September 2004, the SBA told MIP that it ought to draw on the unfunded capital commitments. (Lee Decl. ¶ 40). It reiterated this position in a letter in December 2004. (Lee Decl. ¶ 41). The SBA seeks to draw on these commitments not for purposes of making investments or even for purposes of paying the partnership's expenses, but for the purpose of maximizing the recovery of its debt. (Lee Decl. ¶ 41). Curiously, though, the SBA failed to

[3] The "Lids lawsuit" referenced in the agreement was an adversary proceeding filed by Lids, Inc., a bankrupt corporation, against MIP in the course of Lids's Chapter 11 bankruptcy case. MIP had invested in Lids. The question in the lawsuit was whether Lids could avoid certain security interests it had granted to MIP within ninety days prior to its bankruptcy. MIP's recovery of its investment turned on the outcome. (Lee Decl. ¶¶ 34).

initiate a funds transfer from MIP's bank account to receive the overdue interest payment on the debentures, as it had the power to do. (Lee Decl. ¶ 42).

The SBA set a deadline of December 20, 2004 for MIP to consent to a receivership. (Lee Decl. ¶ 43). The deadline came and went; and the SBA set a new deadline of January 10. (Lee Decl. ¶ 44). Ultimately the SBA filed this action on February 9, 2005—years after it first became aware of MIP's capital impairment.

Had the SBA taken action earlier, MIP likely would have adjusted its investment strategy. (Lee Decl. ¶56). Rather than pursue a strategy meant to maximize long-term returns for the partners, MIP could have pursued a defensive strategy meant to encourage quick liquidity events for the purpose of avoiding capital impairment and satisfying the SBA. It did not because the SBA's conduct lead it to believe that mere capital impairment would not result in acceleration of the debt or a claim for receivership. (Lee Decl. ¶¶ 54-57).

ARGUMENT

A. MIP's Management Is Not Guilty Of Any Wrongdoing.

All of the cases the government cites in which it sought receivership involved serious allegations of impropriety against the SBIC in question or its officers, directors, or shareholders. See First La. Inv. Corp. v. United States, 351 F.2d 494, 496 (5th Cir. 1965) (president and principal shareholder of SBIC made misrepresentations to the SBA and diverted funds for his own benefit); United States v. Vanguard Inv. Co. , 694 F.Supp. 1219, 1225-29 (M.D.N.C. 1988), aff'd, 907 F.2d 439 (4th Cir. 1990) (Vanguard II) (SBIC's officers engaged in self-dealing by pledging the SBIC's bank account as collateral for a loan to another business without receiving consideration); United States v. Vanguard Inv. Co., 667 F.Supp. 257, 263 (M.D.N.C. 1987), aff'd, 907 F.2d 439 (4th Cir. 1990) (Vanguard I) (SBIC's officer informed SBA of a danger that

its corporate records would be destroyed); United States v. Coleman Capital Corp., 295 F.Supp. 1016, 1019 (N.D. Ill. 1969) (SBIC made a loan to company where an officer and director of the SBIC was related to an officer and director of the borrower); United States v. Boca Raton Capital Corp., 285 F.Supp. 504, 505-06 (S.D. Fla. 1968) (SBIC violated SBA regulations prohibiting SBIC from investing more than 20% of its capital in a single company and invested in companies in which the SBIC's shareholders had an interest).[4]

The government's interest in a receivership in such cases is clear. Even if the government is not particularly well-situated to maximize the amount that will be available for payment to creditors, a receiver is necessary where the government has reason to believe that the managers of the SBIC are acting dishonestly. Here, on the other hand, not even the government suggests that it has any reason to believe that MIPGP or MIM has acted or may act dishonestly, has engaged or may engage in self-dealing, or otherwise has engaged or may engage in the kind of conduct that justified a request for a receivership in the cases the government cites. None of the government's audits of MIP disclosed any wrongdoing. (Lee Decl. ¶55). Indeed, rather than divert money from MIP to themselves, the members and managers of MIM and MIPGP decided, for reasons discussed below, not to draw on some of the capital that had been committed. This is clear evidence that the general partner was acting in the interests of MIP rather than in their own

[4] The other cases cited in the government's brief involve facts and claims irrelevant to this case. See ANA Small Bus. Invs., Inc. v. Small Bus. Admin., 391 F.2d 739 (9th Cir. 1968) (SBIC forced to divest itself of some holdings where it was exercising management control over some of its portfolio companies contrary to regulations); Ray v. United States, 374 F.2d 638 (5th Cir. 1967) (related case to First Louisiana, supra; opinion involved Fourth Amendment challenge to criminal conviction on the grounds of an improper search of SBIC's premises); United States v. Cape Fear Capital Corp., 286 F.Supp. 135 (M.D. Pa. 1968) (government sought a declaration of non-compliance with the Act as a prelude to license forfeiture but did not seek a receivership). In United States v. Norwood Capital Corp., 273 F.Supp. 236 (D.S.C. 1967), the government did seek a receiver, but the question in the case was whether the federal court should enjoin an apparently collusive state court receivership proceeding initiated by the SBIC's principal shareholder; the opinion does not specify the government's allegations against the SBIC.

interests. Similarly, MIM, whose members and managers also controlled the general partner, deferred a portion of the contractual management fee, another clear indication that MIP's managers were acting in the interests of MIP rather than trying to line their own pockets.

The government has pointed to no cases in which courts have imposed the drastic remedies of receivership and permanent injunction in the absence of any reason to fear that the SBIC's management has misappropriated money or has otherwise acted improperly. As demonstrated below, there is no sound reason for such remedies in this case. Thus the government's motion is supported neither by precedent nor by policy.

B. The Proposed Remedies Are Not In The Interest of MIP, Its Limited Partners, Its Portfolio Companies, Or Even The SBA.

Since the SBA is seeking the appointment of a receiver despite the absence of wrongdoing, it must believe that there is some other pressing reason that justifies such a remedy. There are two possible reasons for seeking a receivership: first, to liquidate MIP's portfolio, and second, to draw on the unfunded capital commitments.

There is no reason to think that the SBA has nearly as good a chance at liquidating the portfolio for a reasonable price as does MIP itself. It strains credulity to think that an SBA receiver would take the same interest in the MIP portfolio, have the same detailed knowledge of the portfolio companies, or have the same ability to recruit investors as MIP's management. Indeed, MIP's management has solicited two serious preliminary offers from reputable investors, while to its knowledge the SBA has no concrete plan for liquidating the portfolio and no potential investors who have expressed any interest in a purchase. (Lee Decl. ¶¶ 49-52). Moreover, the Court should not simply accept at face value the SBA's belief about the likelihood of recovering the debt MIP owes it. If Congress had intended for the SBA to make such a determination without meaningful oversight, it would have simply given the SBA an

administrative remedy rather than requiring the SBA to proceed in court. See, e.g., Federal Deposit Insurance Act, § 8(a)(3), (h), 12 U.S.C. § 1818(a)(3), (h) (2000) (FDIC may involuntarily terminate a depository institution's insured status after an administrative hearing; while judicial review is available, it does not generally stay the FDIC's administrative order). The Court, particularly since it is being asked to act in equity, should not grant a remedy that is at odds not just with the MIP's interests and the interests of its portfolio companies, but with the interests of the SBA as well.

Nor is the SBA's desire to call the unfunded capital commitments compelling. The SBA at all relevant times had the power to electronically debit the interest payment from MIP's bank account, and it failed to do so even though MIP had enough cash in the account to make the payment. (Lee Decl. ¶ 42).

Neither of the possible justifications for seeking a receiver, then, carries much weight. As a practical matter, the SBA itself will likely be better off if MIP's business remains in the hand of current management; and as a legal matter, the SBA likely lacks the power to call the unfunded capital commitments for the purpose of reducing MIP's debt to it or for the purpose of reducing MIP's capital impairment percentage.

C. The Government's Claim Is Inequitable, And The Government Is Guilty Of Laches.

The traditional rule is that the defense of laches cannot be asserted against the United States, because, as the maxim states, "time does not run against the king." See United States v. Harrison, 188 F.Supp.2d 77, 79 (D. Mass. 2002). But while laches traditionally could not be raised as an affirmative defense in equity, the government's delay can deprive its claim of equity. See Texaco Puerto Rico, Inc. v. Department of Consumer Affairs, 60 F.3d 867, 878-880 (1st Cir. 1995). The reason is that a court acting in equity must always balance the equities in the case to

determine whether relief is equitable, and the plaintiff's dilatoriness is a factor to be weighed. Thus while the government's laches may not technically be an affirmative defense, it is relevant to determining whether the government can succeed on its case in chief. "The government is no more immune to the general principles of equity than any other litigant." Id. at 879 (quoting United States v. Second Nat'l Bank, 502 F.2d 535, 548 (5th Cir. 1974)).

Moreover, the traditional rule against application of the laches defense, which has its source in ancient royal prerogatives no longer relevant to our law, see United States v. Hoar, 26 F. Cas. 329, 330 (C.C.D. Mass. 1821) (Story, J.), is substantially weaker than in the past. The First Circuit has noted that the traditional rule is not an "absolute bar where unreasonable agency delay has caused hardship." Precious Metals Assocs., Inc. v. Commodity Futures Trading Comm'n, 620 F.2d 900, 909 (1st Cir. 1980). Indeed, insofar as in this case the government is acting essentially as a creditor seeking ultimately to recover the debt MIP owes on its debentures, it should be treated as any other commercial party and subject to same equitable requirements. "The United States does business on business terms." United States v. National Exch. Bank, 270 U.S. 527, 534 (1926) (Holmes, J.). In Clearfield Trust Co. v. United States, 318 U.S. 363, 369 (1943), the Court held that the laches of the United States, when suing as drawee on commercial paper, would be a good defense. The same rule should apply here, where the government again is acting in a mere commercial capacity as creditor under the debentures.

Here the evidence of delay and prejudice is strong. MIP has been capitally impaired since 2000. The government has known about the capital impairment since 2000. The government only took action in February 2005, and along the way, made it clear that it would continue to work with MIP's management notwithstanding the capital impairment. As a result of what can only be described as justified reliance on the government's inaction, MIP stuck with its

investment policy, which was geared to long-term returns, not to quick liquidity events. Had the government enforced the capital impairment regulations earlier, MIP could have adjusted its strategy to encourage earlier liquidity events and thus avoid default.

D. The Government's Claim Is Barred By A Contract With MIP.

As noted above, the SBA and MIP agreed to a three-point plan in 2002: (1) MIP's current management would continue to operate MIP, with the goal of liquidating the remaining portfolio holdings, and MIP would not make new investments without the SBA's prior approval; (2) MIP would reduce its management and advisory fee to $500,000 per year for fiscal years 2002 and 2003; and (3) MIP agreed that "If [it] realizes any settlement related to the Lids lawsuit, the entire proceeds will be directed to pay off the Licensee's existing SBA Debentures." The plan was put in place precisely to avoid the consequences of a default under the capital impairment regulations. There is no dispute that MIP has complied with the first and second terms of the agreement. The SBA has suggested that MIP failed to comply with the third term, because the SBA has not received any proceeds from the Lids litigation. But the third term expressly provides that MIP will pay the SBA the proceeds of the litigation if it realizes any. The agreement, which was memorialized in a formal writing prepared on SBA letterhead and presumably drafted by counsel, is clear on its face. It expressly contemplated the possibility that MIP would not recover anything in the Lids litigation. Since it is apparent from the SBA's letter of May 25, 2004 (attached as Exhibit 6 to the Lee Declaration) that the failure to recover from Lids was linked to the decision to declare MIP in default, it is clear that the SBA's decision to declare the default and require MIP to cure it were contrary to the terms of the three-point agreement. Since the consideration for MIP's promises was the government's promise to allow MIP to continue to operate even though a state of capital impairment existed, it is hardly

equitable for the government now to point to the capital impairment as grounds for a receivership, particularly since MIP has kept its side of the bargain.[5]

E. The Government's Motion For Permanent, Rather Than Preliminary, Relief Is Premature.

The government is seeking a permanent injunction and the permanent appointment of a receiver, notwithstanding the fact that it has sought preliminary injunctive relief, and even temporary restraining orders, in other cases. See, e.g., Vanguard I, supra (government sought temporary restraining order and temporary receivership); Boca Raton Capital, supra (same). Evidently, the government does not believe that its claim is pressing enough to warrant preliminary or emergency relief. In any case, under the Rules of Civil Procedure, it is improper to move for permanent injunctive relief and the appointment of a permanent receiver at such an early stage in the case. MIP has not yet even answered the complaint.[6] Moreover, under the Rules, the proper course is clear: final remedies come after entry of a judgment. If the government believes its case is strong enough to warrant a summary judgment, it should move for summary judgment. A plaintiff who does not choose to seek preliminary relief is not entitled to move for permanent equitable relief before the defendant has had the opportunity to engage in the usual course of litigation, including discovery.

If the government had followed the proper procedures and sought summary judgment before seeking permanent injunctive relief, MIP would have sought to delay a hearing under Rule 56(f) on the grounds that discovery is not complete. MIP is proceeding diligently with discovery, both informal and formal. For instance, MIP has informally interviewed persons

---

[5] This argument is also a defense to one of the factual bases of the government's claim, namely, that the government permissibly accelerated the debentures. (See, e.g., Complaint ¶ 19). MIP's position is that the government's contract with MIP not only forecloses its efforts to seek a receivership on account of the capital impairment, but also prevented the government from accelerating the debentures on account of the capital impairment.

[6] Its answer is being filed herewith.

familiar with the SBA's policies and changes in its policies, with an eye to proving that the SBA has radically changed its policy regarding the calling of unfunded commitments late in the game in a way that inequitably prejudices MIP. MIP has also served a first request for production of documents on the government, a copy of which is attached to this memorandum as Exhibit A, and it intends to follow up with interrogatories and depositions, as a prudent party would in any complex commercial case.

CONCLUSION

For the foregoing reasons, the Court should deny the plaintiff's motion.

Respectfully submitted,

MARATHON INVESTMENT
PARTNERS, L.P.,

By its attorneys:

/s/ Theodore J. Folkman
Charles R. Bennett, Jr. (BBO No. 037380)
Theodore J. Folkman (BBO No. 647642)
HANIFY & KING, P.C.
One Beacon Street
Boston, Mass. 02108
(617) 423-0400

Dated: March 14, 2005

425470

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

Plaintiff,

vs.

MARATHON INVESTMENT PARTNERS, L.P.,

Defendant

Civ. A. No. 05-10255-MEL

**DEFENDANT'S FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS**

Pursuant to Fed. R. Civ. P. 34, the defendant, Marathon Investment Partners, L.P., requests that the plaintiff, the United States of America, produce for inspection and copying the documents designated below at 10 a.m. on April 6, 2005 at the offices of Hanify & King, P.C., One Beacon Street, Boston, Mass. 02108.

DEFINITIONS AND INSTRUCTIONS

1. The definitions set out in Local Rule 26.5(c) are incorporated herein.

2. The word "or" is disjunctive but not exclusive, i.e., "A or B" means A, B, or A and B.

3. "SBA" means the Small Business Administration.

4. "MIP" means the defendant, Marathon Investment Partners, L.P.

5. "SBIC" means a small business investment company.

5. If you withhold any document on a claim of privilege or under the work product rule, with respect to each document withheld state: (a) the author and recipients; (b) its date; (c) the subject matter of the document; (d) the nature of the document (e.g., letter, e-mail, etc.); (e)

317

the reason why the document is claimed to be privileged or to constitute work product; and (f) the paragraph of this request to which the document is responsive.

REQUESTS

1. All documents created from 1999 to the present, including but not limited to general counsel's opinions, concerning SBA policies or practices concerning the calling of unfunded commitments.

2. All documents created from 1999 to the present, including but not limited to general counsel's opinions, concerning SBA policies or practices concerning liquidation of SBICs that are in a state of capital impairment, as that term is defined in 13 C.F.R. § 107.1830.

3. All documents concerning communications between the SBA and MIP from 1999 to the present.

4. All documents concerning audits of MIP from 1999 to the present.

5. All documents concerning the decision to seek appointment of a receiver for MIP.

Respectfully submitted,

MARATHON INVESTMENT PARTNERS, L.P.

By its attorneys:

[signature]

Charles R. Bennett, Jr. (BBO No. 037380)
Theodore J. Folkman (BBO No. 647642)
HANIFY & KING, P.C.
One Beacon Street
Boston, Mass. 02108
(617) 423-0400

CERTIFICATION OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party ~~by mail~~ (by hand) on 3/7/05.

[signature]

Dated: March 7, 2005
424897