IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MARATHON INVESTMENT PARTNERS, L.P.,<br><br>Defendant | )<br>)<br>) Civ. A. No. 05-10255-MEL<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF CLIFFORD J. LUSSO

Clifford J. Lusso deposes and says as follows:

1.      My name is Clifford J. Lusso. I am a manager of Marathon Investment Partners GP, LLC, which is the general partner of Marathon Investment Partners, L.P. ("MIP"), the defendant in this case. I am also a manager of Marathon Investment Management, LLC, the management company charged with management of MIP.

2.      I hold a bachelor of science degree in business administration, with a concentration in finance, from Salem State College.

3.      I have over nineteen years of experience in the financial management, venture capital, and commercial banking fields. From 1982 to 1984, I was an asset-based lending field examiner with Shawmut Bank, where I performed collateral and credit analyses of asset-based borrowers and prospects. From 1984 to 1998, I was with BankBoston Corp., formerly BayBank, rising from loan officer to senior vice president in the asset-based lending department and ultimately to Director/Team Leader of underwriting and portfolio management.. My responsibilities included new business development, portfolio management, workouts, and collections of troubled loans. I was responsible for management of an asset-based loan portfolio

of more than $450 million in commitments, which included more than seventy New England-based companies. From 1998 to the present, I have been involved in the management of MIP. From 2002 to the present, I have also served as vice president of finance for IHS Companies.

4. My colleague Tom Lee's Declaration sets out the facts concerning the organization and capitalization of MIP and the facts concerning MIP's dealings with the SBA. The remainder of this affidavit concerns my involvement with some of the companies in which MIP invested.

5. I share Tom's opinion that the appointment of a receiver would be extraordinarily and needlessly harmful to the small businesses in which MIP has invested, to MIP's limited partners, and to the Small Business Administration.

American Pipe and Plastics, Inc.

6. American Pipe and Plastics, Inc. ("APP") is in the business of manufacturing polyvinyl chloride pipe for the construction, sewer pipe rehabilitation, telecommunications, and power industries. Its business is seasonal, since much of its product is manufactured for underground burial.

7. MIP presently holds a promissory note from APP in the principal amount of $1.5 million, with interest at 14%. MIP also owns common and preferred stock and warrants giving it a 7.23% equity stake in APP.

8. APP suffered from poor performance due to the crash in the telecommunications industry and its high raw material costs. However, its performance is improving.

9. I have served as an observer to the Board of Directors and I have advised management and other investors in the need for a turnaround and workout professional to assist APP with a turnaround. As a result of my advice, in 2004 APP hired the Loftus Group, a

turnaround management consulting company. I also advised the Board and the lad investor during their workout negotiations with the senior lender, Webster Bank. My advice helped APP achieve a financing structure that would provide APP with the liquidity and time needed to execute the turnaround plan while allowing Webster Bank to protect its position and to comply with its credit requirements.

      10.      Since 2004, the Loftus Group has helped APP to improve its revenues, margins, and sales.

      11.      Finally, I and MIP have assisted APP by temporarily accruing interest due on its debt to MIP. In my opinion, if a receiver were to make a demand on APP, the result would likely be the failure of the business.

      12.      MIP's expectation is that assuming it continues to provide assistance to APP, and assuming that a receiver does not make a demand for the past due interest in the short term, APP will be in a position to begin to pay interest on its debt in 2006.

Retail Solutions, LLC

      13.      Retail Solutions, LLC ("RS") is in the business of data warehousing and consulting.

      14.      MIP presently holds a promissory note from RS in the principal amount of $250,000, with interest at 14%, and warrants to purchase 3.12% of the outstanding common stock.

      15.      I have served on RS's Board of Directors. In that capacity, I assisted RS in difficult negotiations with Fleet Bank in 2002 and 2003 concerning RS's line of credit and the restructure of certain leases. In 2003, when the Board and management decided that it required additional capital to remain in business, I introduced RS to Venture Capital of New England,

which with two other investors provided $4.5 million to RS in 2004. MIP and I assisted and advised RS's management in the negotiations with the new investors.

16. The note matures in March 2006. MIP expects that RS will buy out its interest in the short term. MIP believes, based on the valuation implied by the Venture Capital of New England transaction, that its warrants are be worth $200,000 .

Spencer Technologies, Inc.

17. Spencer Technologies, Inc., ("Spencer") is in the business of designing, configuring, and installing telecommunications and data networking equipment, primarily for retailers. It has nationwide capabilities.

18. MIP presently holds a promissory note from Spencer in the principal amount of $2.15 million, with interest at 14%, and $500,000 in common and preferred stock (valued at cost). MIP's equity investment gives it a 28% equity stake in Spencer.

19. I am an active member of the Board of Directors and an advisor to Spencer's management.

20. Spencer's present goal, which I believe to be reasonable, is to raise enough new capital in the next six months to pay off the promissory note and to purchase MIP's preferred stock. The preferred stock is valued (at cost) at $498,782.

21. I have guided the company through several difficult rounds of negotiations with Spencer's former senior lender, Fleet Bank. The first of these took place in 1999, when Spencer discovered that a large account receivable was uncollectible and that its sales were lower than expected. I assisted Spencer in formulating a plan to stabilize the company and to provide assurances to Fleet.

22. Similarly, in 2001 and 2002, I advised Spencer in negotiations with Fleet that helped to stabilize the company and made it possible for Fleet to continue to support Spencer through a turnaround.

23. Spencer pursued a failed merger in 2003, against my advice, that resulted in a large one-time expense and that distracted management from the problem presented by lower revenues in the second half of 2003. Spencer called off the merger negotiations on my advice, and thereafter, I assisted Spencer in refinancing its senior debt by introducing Spencer to Webster Bank, its new senior lender.

24. MIP has assisted Spencer in bringing in new, experienced management. Spencer's new chief financial officer, whom MIP helped Spencer to find, and who started work in January of 2004, has significantly controlled expenses and managed cash flow.

25. MIP is presently assisting Spencer in raising additional capital, which Spencer hopes to do in the next six months. This assistance has taken several forms. MIP has, for example, introduced Spencer to potential investors, helped to prepare the package of information Spencer distributed to those potential investors, and provided general investment advice.

26. MIP has played a critical role in advising Spencer's principal, who is a young manager with limited experience. It is my opinion, based on my knowledge of Spencer's business and its managers, that if MIP ceases to advise the company, the company will be at substantial risk of failure. I do not believe that a receiver, who necessarily will lack my knowledge of the business and will most likely not adopt a hands-on approach to assisting Spencer, can provide Spencer with the kind of support that MIP has provided.

27. MIP's expectation is that assuming it continues to provide assistance to Spencer, Spencer will be in a position to buy out its debt to MIP in 2005 or 2006. MIP is currently

assisting Spencer in negotiating a refinancing to achieve this goal.

    I declare under penalty of perjury that the foregoing is true and correct. Executed on March 14, 2005.

                                              /s/ Clifford J. Lusso
                                              Clifford J. Lusso

425562