IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>vs. )<br><br>MARATHON INVESTMENT PARTNERS, L.P., )<br><br>Defendant ) | Civ. A. No. 05-10255-MEL |

## DECLARATION OF THOMAS F. LEE

Thomas F. Lee deposes and says as follows:

1.      My name is Thomas F. Lee. I am a manager of Marathon Investment Partners GP, LLC, which is the general partner of Marathon Investment Partners, L.P., ("MIP") the defendant in this case. I am also manager of Marathon Investment Management, LLC, the management company charged with management of MIP.

2.      I hold a bachelor of science degree in business administration from Boston College and I am a graduate of the Graduate School of Banking of the University of Wisconsin.

3.      I have over thirty years of experience in banking, finance, and investment. In several of my professional positions, I have developed expertise in the investment business in which I am now engaged at MIP.  From 1981 to 1991, I was a Senior Vice President of Fleet Bank of Massachusetts, N.A., where I managed a highly profitable, specialized asset-based lending group of fifty employees with approximately $1 billion in outstanding commitments and more than $500 million in loans. From 1991 to 1998, I was the assistant managing director and regional vice president of BTM Capital Corporation, a subsidiary of the Bank of Tokyo—

Mitsubishi. I was recruited by BTM to establish a national asset-based lending group. Presently, in addition to my role in MIP, I manage two mezzanine funds.

4.    I make this declaration in support of MIP's opposition to the government's motion for injunctive relief and appointment of a receiver. In my opinion, the appointment of a receiver would be needlessly harmful to the small businesses in which MIP has invested, to MIP's limited partners, and to the Small Business Administration ("the SBA") itself. It is also my opinion, based on my knowledge of the dealings between the SBA and MIP, that the SBA has done an abrupt about-face in its dealings with MIP and is seeking harsh remedies on account of a technical default that it tolerated and condoned for years.

<u>Organization and Capitalization of MIP</u>

5.    MIP was organized as a limited partnership under the laws of Delaware in May 1998 for the purpose of investing in small businesses. To that end, MIP was licensed in September 1998 by the SBA as a small business investment company, or SBIC.

6.    MIP obtained capital commitments of $17.1 million, of which $10.5 million was from institutional investors, $5.5 million was from individual investors or entities controlled by individuals, and $1.1 million was from MIP's general partner.

7.    MIP also obtained capital by issuing debentures in October 1999, which the SBA guaranteed under Section 303 of the Small Business Investment Act of 1958, as amended.  These debentures are at issue in this lawsuit.

8.    MIP has regularly drawn on its capital commitments. In 1998, it drew approximately $3 million. In 1999, it drew $1.5 million. In 2000, it drew $1 million. In 2001, it drew $9.25 million. In 2002 and in the following years, for reasons described below, it did not

draw further on its capital commitments. Thus at present, approximately $2.34 million of the total capital commitment is unfunded.

MIP's Investments

9.      MIP has been making investments since the winter of 1999. Its current portfolio comprises debt and equity securities of seven companies. (It wrote off its investments in two of these companies, which were under bankruptcy protection, in 2004).  My colleague Cliff Lusso's Declaration discusses the portfolio companies that he has handled. In this section of my Declaration, I outline the contributions MIP and I have made to those of the portfolio companies that I handled, and the reasons that appointment of a receiver would, in my view, greatly diminish the companies' prospects.

Stonewall Kitchens, Inc.

10.      Stonewall Kitchens, Inc. ("Stonewall") is a manufacturer of jams, jellies, and salad dressings. It sells its products at retail and wholesale and through catalogues.

11.      MIP presently holds a promissory note from Stonewall in the principal amount of $1.5 million, with interest at 12%, and warrants to purchase 7% of the outstanding common stock. The note is due on June 30, 2005.

12.      I serve on the board of Stonewall and have intimate knowledge of its business.

13.      MIP has advised and is advising Stonewall on refinancing the debt that is coming due in June. For example, MIP is assisting Stonewall in locating a new investor and raising an additional $4 to $7 million in capital.

14.      I understand that Stonewall believes it is likely to be bought in perhaps five years for between $35 and $70 million. This belief is reasonable, in my opinion.

15.     I also understand that Stonewall would like to purchase MIP's warrants. Stonewall cannot now afford to purchase them at a price that reflects the value the company is likely to have if, as it expects, it is purchased in the medium term. However, if Stonewall's projections are correct, the warrants stand to become quite valuable.

16.     It is my belief that a receiver would be unlikely to be able or willing to provide assistance and advice to Stonewall as MIP has done.  I have dedicated a substantial portion of my time to MIP and its portfolio companies, and a receiver, particularly an institutional receiver such as the SBA, is unlikely to devote as much time and effort to the portfolio companies. Appointment of a receiver would therefore increase substantially the risks that Stonewall will be unable to refinance the maturing debt this June or to be acquired for an amount as great as it now hopes it will be able to realize. If either of these risks come to pass, both Stonewall and MIP will suffer. To the extent MIP suffers, the SBA, its creditor, will suffer as well.

17.     MIP's expectation is that assuming it continues to provide assistance to Stonewall, Stonwall will be in a position to buy out its debt to MIP later in 2005.

Maine Trailer, Inc.

18.     Maine Trailer, Inc. ("Maine Trailer") is in the business of leasing over-the-road trailers.

19.     MIP presently holds a promissory note from Maine Trailer in the principal amount of $1 million, with interest at 12.5%. MIP also owns 500,000 shares of preferred stock and warrants to purchase 26.5% of the common stock.

20.     I am a member of Maine Trailer's board of directors and am intimately familiar with its business.

21.    MIP has assisted Maine Trailer with refinancing of its senior debt, which resulted in a larger line of credit, increased availability, a more favorable amortization schedule, and better pricing. Recently MIP also assisted Maine Trailer in renegotiating the covenants in its agreement with its lender.

22.    Maine Trailer has performed well in recent fiscal years and has a strong balance sheet. It is presently undertaking an expansion of its business into southern Maine and is considering acquiring another business. In connection with these plans, Maine Trailer may be seeking additional capital from MIP.

23.    It is my opinion that MIP has, through its general financial advice and its assistance with debt restructuring, substantially improved Maine Trailer's performance. Moreover, I do not believe that a receiver, who necessarily will lack my knowledge of the business and will most likely not adopt a hands-on approach to assisting Maine Trailer, can provide Maine Trailer with the kind of support that MIP has provided. In the absence of such hands-on assistance, it is my opinion that the chances that Maine Trailer will successfully manage its expansion and acquisition plans will be substantially diminished.

24.    MIP's expectation is that assuming it continues to provide assistance to Maine Trailer (including the additional capital Maine Trailer is seeking), Maine Trailer will be in a position to buy out its debt to MIP in 2006.

The SBA's Dealings With MIP

25.    MIP has been in a condition of capital impairment since 2000.

26.    In September 2000, in response to an inquiry from MIP, Phyllis Dawson of the SBA informed MIP that other SBICs had been in a similar situation, and that in such cases the SBA generally asked management to provide expected results for the next two to three years. A

true copy of an e-mail from Ms. Dawson to Paul Bolger dated September 12, 2000 is attached to this Declaration as Exhibit 1.

27.    In early January 2001, Ms. Dawson informed MIP that the SBA was considering sending MIP a default letter on account of MIP's condition of capital impairment. However, the SBA did not then issue such a letter.

28.    In March 2001, MIP presented the SBA with an updated operating plan that assumed additional leverage would be forthcoming from the SBA, as well as a contingency plan that assumed that the SBA would be unwilling to provide additional leverage.

29.    Ms. Dawson rejected the plan by letter dated March 29, 2001, a true copy of which is attached to this Declaration as Exhibit 2. In that letter, Ms. Dawson also notified MIP that it was in default under the capital impairment regulations and that MIP was required to cure its impairment by June 30, 2001.

30.    By letter dated June 19, 2001, a true copy of which is attached to this Declaration as Exhibit 3, the SBA extended the deadline to cure the capital impairment to July 16, 2001. The letter warned: "SBA must be in receipt of executed legal documents to effect the reassignments [of certain limited partnership interests] by noon that day and impairment cured otherwise SBA may seek the remedies afforded it under section 107.1810 of the SBA regulations."

31.    The SBA did not follow through on its threat. MIP continued in a state of capital impairment through the end of 2001. The SBA and MIP agreed that MIP would only make follow-on investments unless it had the SBA's prior written approval, but the SBA did not require MIP to cure its condition of capital impairment.

32.    By letter of March 20, 2002, a true copy of which is attached to this Declaration as Exhibit 4, MIP requested that the SBA waive capital impairment requirement and allow its

present management to operate MIP. Following this letter, SBA and MIP held a meeting in Washington on May 7.

33.     At the May 7 meeting, the SBA agreed that MIP had a "viable plan for repaying the SBA's Debenture Leverage." Accordingly, MIP and the SBA agreed to a three-point plan: (1) MIP's current management would continue to operate MIP, with the goal of liquidating the remaining portfolio holdings, and MIP would not make new investments without the SBA's prior approval; (2) MIP would reduce its management and advisory fee to $500,000 per year for fiscal years 2002 and 2003; and (3) MIP agreed that "If [it] realizes any settlement related to the Lids lawsuit, the entire proceeds will be directed to pay off the Licensee's existing SBA Debentures." A true copy of a letter agreement dated June 19, 2002 setting out the terms of this agreement is attached to this Declaration as Exhibit 5.

34.     The "Lids lawsuit" referenced in the agreement was an avoidance proceeding against MIP filed by Lids, Inc., a bankrupt company in which MIP had invested. MIP's recovery of all or part of its investment in Lids turned on the outcome of the litigation.

35.     In August 2002, the bankruptcy court in the Lids litigation issued an unfavorable ruling, and as a result MIP did not recover anything on account of the litigation. MIP promptly made the SBA aware of the outcome of the litigation.

36.     Still, the SBA did not impose sanctions on account of MIP's state of capital impairment.

37.     At a meeting held August 27, 2003, the SBA agreed to permit MIP to continue to operate under the terms of the June 19 letter.

38.    By letter dated May 25, 2004, a true copy of which is attached to this Declaration as Exhibit 6, the SBA notified MIP that it was in default under the terms of the debentures and 13 C.F.R. § 107.1810(f)(5). It demanded that MIP cure its capital impairment within fifteen days.

39.    More than three months later, the SBA notified MIP that it had not cured the impairment, and that the SBA was therefore accelerating the debentures, with payment demanded within fifteen days. A true copy of the notification, dated September 2, 2004, is attached to this Declaration as Exhibit 7.

40.    At a meeting held on September 10, 2004, the SBA stated to MIP managers that it wanted MIP to call the remaining unfunded capital commitments. SBA had known since at least 2000 that MIP had not called these commitments.

41.    In a letter dated December 8, 2004, a true copy of which is attached to this Declaration as Exhibit 8, the SBA stated that the recovery of the unfunded commitments was an SBA priority. I understand the SBA's position to be that it seeks to call the unfunded commitments not in order to make new investments, but rather to reduce its own losses in the event MIP is unable to repay its debt to the SBA.

42.    The SBA's insistence on calling the unfunded commitments is puzzling, because the SBA had the power to withdraw money from MIP's bank account at any time by means of a funds transfer. There was more than enough cash in the account to pay the interest then due on the debentures. Yet the SBA failed to withdraw this money.

43.    The December 20 letter also stated that the SBA would "be filing court pleadings requesting that it be appointed liquidating receiver of Marathon on or about December 20, 2004" unless MIP consented to a receivership.

44.     After further correspondence between MIP and the SBA, the SBA wrote, in a letter dated January 3, 2005, a true copy of which is attached to this Declaration as Exhibit 9, that it would file "an adversarial complaint and motion for receivership" unless MIP consented to a receivership by January 10.

45.     Ultimately, the SBA filed the complaint in this action on February 9, 2005.

MIP's Good Faith

46.     MIP's general partner and management company, and I personally, have little if anything to gain, in a financial sense, by opposing the SBA's motion for appointment of a receiver.

47.     First, Marathon Investment Management, LLC ("MIM"), MIP's management company, has been deferring a portion of its management fees since October 2000. These management fees are not for profit, but are gross fees out of which MIP must pay its overhead. Since the deferral, MIM has made very little, if any, profit.

48.     Second, MIP's decision not to draw on the remaining unfunded capital commitment was motivated by MIP's concern to preserve capital, not to benefit MIM, the general partner, or me.

49.     Third, MIP approached the SBA in September 2004 with a letter of intent from the Massachusetts Business Development Corp., an established investment firm, which proposed to purchase MIP's investments in three of the five portfolio companies (Maine Trailer, RS, and Stonewall) for $3.25 million, or 100% of MIP's original investment, with a promise to pay the SBA the proceeds of future sales of MIP's equity interests in the three companies. MBDC also proposed to purchase MIP's interests in APP and in two portfolio companies in bankruptcy at a nominal price and to split the proceeds of any collection efforts with the SBA. Finally, MBDC

proposed to purchase MIP's investment in Spencer for $750,000, or approximately 28% of MIP's cost, plus 20% of any amounts recovered above that amount from the repayment of Spencer's promissory note or from the sale of the Spencer preferred stock.

50.    The SBA rejected this overture. In its January 3 letter, the SBA stated that it had had "proven success" in handling receiverships.

51.    In my experience, the SBA's position is entirely unrealistic. There is no reason to believe that an employee of the SBA, who has no first-hand knowledge of the business of the portfolio companies and who lacks the knowledge of local lenders, investors, and managers that Cliff Lusso and I bring to MIP, could do nearly as well as we could in terms of maximizing the recovery of the SBA's investment.

52.    Even though the SBA rejected MIP's overture concerning MBDC, I and my colleague Cliff Lusso have continued to solicit interest from potential buyers of MIP's portfolio. Attached to this letter as Exhibit 10 is a true copy of a letter from Saugatuck Capital Co., L.P., which has expressed interest in making an offer to purchase. It is my belief that such a purchase will provide the best outcome for MIP's portfolio companies and for the SBA, since an experienced private investor such as Saugatuck or MBDC is more likely than an SBA receiver to maximize the SBA's recovery and to steer the portfolio companies towards future good performance and eventual liquidity events.

53.    It is also important to make it clear that the SBA has not accused me or any of the other managers of MIP of any wrongdoing. Indeed, the SBA itself has audited MIP on several occasions, and none of the audits have found any wrongdoing.

<u>Prejudice To MIP</u>

54.     MIP has taken a patient, long-term approach to investing. It has not sought to force its portfolio companies towards liquidity events too early. Its goal has been to maximize the long-term returns for its limited partners (and, of course, for the general partner) while meeting its obligations to creditors such as the SBA.

55.     Since MIP has been capitally impaired for several years, its approach to investing was possible only because of the SBA's long-term policy of forbearance regarding MIP's capital impairment.

56.     It is impossible to know precisely what MIP would have done had the SBA determined to attempt to put MIP into receivership at an earlier time. However, it is likely that had the SBA taken action earlier, MIP would have sought to encourage its portfolio companies to reach liquidity events sooner in order to reduce its capital impairment. This would not, in my view, have been in the long-term best interests of MIP or its partners (or more importantly, the portfolio companies), but it would have been in their short-term best interests, because it would have avoided an acceleration of MIP's debt to the SBA.

57.     MIP did not take this course of action because it relied on the message the SBA's conduct clearly sent, namely, that mere capital impairment would not lead to acceleration of the debt or receivership.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 14, 2005.

/s/ Thomas F. Lee
Thomas F. Lee

425469

## Paul Bolger

**From:** phyllis.dawson@sba.gov
**Sent:** Tuesday, September 12, 2000 4:04 PM
**To:** bolger@marathoninvestment.com; phyllis.dawson@sba.gov
**Cc:** fonda.stephens.kelly@sba.gov
**Subject:** RE: thank you

You're welcome!

To answer your question, yes, other funds have been in your poistion.  Generally, we ask managment to show us expected results for the next 2-3 years which is why I 'd asked to see your 9-30 results and Petco's (Petco's acutal vs budgeted results weren't as bad as I expected; unfortunately, their cost structure is pretty high).

Additionally, I'll review the projections submitted with your license application with Fonda and probably have you update/revise them using 9-30 results as the starting point.  The projections should be quarterly for the first 15 months then semi-annually thereafter.  You can use whatever format is effective for you, but include information on new investments, interest and dividend income, sale of investments and any related gains on sale, write-downs, write-offs, capital calls, leverage requests, etc. essentially I'd like your best guess of cashflows for the next 24-36 months with emphasis on the first 12 months.

Upon reviewing your projections and the valuation report you and I can decide whether a meeting here in Washington is necessary.  A conference call may suffice.

-----Original Message-----
From: Paul Bolger [mailto:bolger@marathoninvestment.com]
Sent: Tuesday, September 12, 2000 2:48 PM
To: phyllis.dawson@sba.gov
Cc: Fonda Stephens-Kelly
Subject: thank you


Phyllis

Thank you for approving the draw request today. At your convenience, I would really like to continue our conversation of yesterday regarding your concerns about Marathon and how we can make things better.  I am sure you have had other funds in situations similar to ours.  How did they work through their issues with the SBA?  Can you, Fonda, or someone else provide any guidance?  Please let me know when it would be convenient to contact you.  We would be happy to travel to Washington if that is the most appropriate venue.  Thanks again for your support.

Regards,

Paul Bolger

09/29/2000



**U.S. Small Business Administration**
Washington, DC 20416

License No. 01/01-0370

March 29, 2001

Mr. Paul Bolger
Managing Director
Marathon Investment Partners ("Licensee")
10 Post Office Square, Suite 1225
Boston, Massachusetts 02109

Dear Mr. Bolger:

SBA appreciates your cooperation and timeliness in keeping SBA informed regarding the recent
down turn in the Licensee's financial position resulting from the write-off of your investment in
Pet Corner, LLC, the pending write-off of Data Profit, Inc. and the write-down of Lids, Inc. As
you have advised SBA these actions will increase the Licensee's Capital Impairment to 41.7
percent (see §107.1830 and §107.1840 of the SBA regulations). The Licensee's maximum
permitted impairment is 40 percent given its outstanding SBA-guaranteed leverage to
Leverageable Capital ratio and percentage of equity investments to total investments.

If the Licensee were to issue a capital call for all of the remaining unfunded capital commitments
its condition of capital impairment would be cured. The Licensee's plan dated March 9, 2001,
however, proposes gradual draws of capital throughout 2001 with impairment eliminated during
the second quarter of 2001. Your plan, also, assumes issuance of additional SBA-guaranteed
leverage during the fourth quarter of 2001 and thereafter. According to your projections,
however, the impairment percentage will remain above SBA's credit guidelines for additional
draws of SBA-guaranteed leverage.

Therefore, SBA hereby notifies Marathon Investment Partners that it is in default under
§107.1810(f)(5) of the SBA regulations and must cure its impairment not later than June 30,
2001. At such time that the Licensee's impairment remains below 80 percent of the maximum
permitted impairment (see chart under §107.1830(c)(2)) for two consecutive quarters SBA will
consider an application for additional SBA-guaranteed leverage.

The Licensee's understanding of the seriousness of the situation and cooperation in correcting its
condition of Capital Impairment will be appreciated. Should you have questions please call me
at 202-205-7554, or Fonda Stephens-Kelly at (202) 205-7596.

Sincerely,

Phyllis E. Dawson
Chief, Area II
Office of SBIC Operations





**U.S. SMALL BUSINESS ADMINISTRATION**
WASHINGTON, D.C. 20416

**SENT BY FACSIMILE**

License No. 01/01-0370

JUN 19 2001

Mr. Paul Bolger
Managing Director
Marathon Investment Partners ("Licensee")
10 Post Office Square, Suite 1225
Boston, Massachusetts 02109

Dear Mr. Bolger:

SBA is in receipt of your June 13, 2001 letter wherein you indicate the General Partner's (the "GP") decision to decline Mr. Shaller's proposal to assume the commitments of two other limited partners, who wish to withdraw from the partnership. As provided for in the limited partnership agreement dated May 29, 1998, the GP has decided to offer said partnership interests to other limited partners. The completion of this process may extend beyond June 30, 2001 the date the Licensee must cure its condition of Capital Impairment. Consequently, the Licensee is requesting a 60-day extension to negotiate the assignment of partnership interests and execute appropriate legal documents. Additionally, the GP will exercise its options under the limited partnership agreement regarding Messrs. Weener's and Litle's default.

Given that the Licensee has reported tentative agreement for approximately two-thirds of the amount needed, SBA will extend the cure date deadline to Monday, July 16, 2001. SBA must be in receipt of executed legal documents to effect the reassignments by noon that day and impairment cured otherwise SBA may seek the remedies afforded it under section 107.1810 of the SBA regulations.

As always your cooperation is appreciated. Should you have questions please call Phyllis E. Dawson at 202-205-7554, or Fonda Stephens-Kelly at 202-205-7596.

Sincerely,

Ronald C. Cibolski
Director
Office of SBIC Operations

**SBA IS AN EQUAL OPPORTUNITY EMPLOYER AND PROVIDER**

Federal Recycling Program ♻ Printed on Recycled Paper

March 20, 2002


Ms. Phyllis E. Dawson
Office of SBIC Operations
U.S. Small Business Administration
409 Third Street, S.W.
Washington, DC 20416


Dear Phyllis,

Enclosed please find copies of our audited financial statements and SBA 468 Report for the year ended December 31, 2001, an updated operating plan, and a detailed analysis of our portfolio companies. At your earliest convenience, we would like to meet with you to discuss our plan to repay all SBA obligations as agreed, maximize returns to our investors, and continue to provide value added services to our portfolio companies.

As we discussed in our meeting on December 13, 2001, Marathon is in violation of SBA's Capital Impairment Ratio as of December 31, 2001 due to the liquidation or bankruptcy of several portfolio companies. These companies were significantly impacted by the severe decline in the economy, as well as the restrictive banking and capital markets. The restoration of our capital base is dependent on the resolution of the Lids lawsuit, and the timing of several portfolio company liquidity events. We are awaiting the judge's decision on Lids, and in the meantime, the unsecured creditors committee has agreed to escrow $3.4 million of the estate's proceeds. It is essentially an all or none decision for us. Given the increased caseload in the Delaware Bankruptcy Court, it is difficult to project when the judge will make a decision. However, all parties believe it will be made prior to year-end.

Two portfolio companies, Humanitees and Spencer, are interested in creating a liquidity event for investors but both need to wait until operating trends and market conditions improve. Consequently, we are not projecting a liquidity event until 2003. Another company, New Weathervane, is anticipating an IPO sometime in the next several years, but would probably consider selling if the right offer came along. The company is outperforming its peer group in a tough retail environment. It is also raising capital, and the valuation may allow us to write-up our investment, thereby improving our capital base somewhat.

We have developed three financial scenarios for our operating plan: one where we collect $3.4 million from Lids and reinvest proceeds: a second where we collect from Lids but the proceeds

are used to pay off debt: and a third where we lose the Lids case.  In all three scenarios we plan on maintaining sufficient cash and unfunded Capital Commitments to pay all SBA obligations on time and in full.  As you know, we have already voluntarily reduced the management fee by more than 20%.  We are willing to discuss a further reduction in the fee in order to demonstrate our commitment to repaying the SBA and maximizing returns to our Limited Partners.

Furthermore, over the past year, we played a key role in maintaining the financial viability and employment levels at several portfolio companies.  Specifically, Humanitees and Spencer relied heavily on our commercial lending experience, and our relationships with their senior lenders to renegotiate their borrowing facilities.  We also assisted them with strategic planning, cost containment, marketing, and personnel issues.  As a result, both are more stable companies, and are better positioned to effect a liquidity event in the next twenty-four months.  In the interim, our continued participation and support are essential to insure the maximum return for all investors.

Specifically, we are requesting that SBA waive the violation of the Capital Impairment Ratio and allow Marathon's management to continue to operate the Fund without restriction, provided there are no payment defaults on any SBA obligation.  We believe that this scenario gives us the best opportunity to maximize returns for investors and to continue to provide valuable financial and management services to our portfolio companies.  We hope that as you consider our request, you will reflect on the fact that we have always been pro-active about reporting significant portfolio and operating events that might impact SBA's position, and that you can count on us to continue to communicate in this manner.

As always, we appreciate your support and candor, and look forward to meeting with you and you colleagues at your earliest convenience.

Very truly yours,

Paul Bolger
Managing Director

Enclosure

Cc:    Ms. Fonda Stephens-Kelly
       Mr. R. Michael Haynes



**U.S. SMALL BUSINESS ADMINISTRATION**
WASHINGTON, D.C. 20416

License No. 01/01-0370

JUN 1 9 2002

Mr. Paul Bolger
Managing Director
Marathon Investment Partners, L.P.
111 Devonshire Street, 4th Floor
Boston, MA 02109

Dear Mr. Bolger:

We appreciate the management team of Marathon Investment Partners, L.P. ("Licensee") joining us in Washington, DC on May 7, 2002 for a Portfolio Review of the Licensee. The update that the General Partners provided was both frank and insightful and allowed the SBA to get a better sense for the health of the Licensee's portfolio holdings.

From our discussions, it seems as if the Licensee has a viable plan for repaying the SBA's Debenture Leverage. Accordingly, the SBA has laid out the following terms and conditions under which it will allow Marathon's existing management team to continue operating the Licensee.

1.    Marathon should operate the Licensee in a manner that will result in the timely liquidation of its remaining portfolio holdings. It should not engage in new investments and make only follow-on investments with the prior approval of the SBA.

2.    It is prudent for the Licensee to reduce its overhead and pare its management and advisory fee. As discussed, we expect the Licensee to cut its management and advisory fee to $500,000 per annum for the remainder of FY'02 and FY'03. Should circumstances not improve materially, additional reductions may be necessary thereafter.

3.    The full recovery of the Licensee's $3.4 million investment in Lids, Inc. will go a long way to improving Marathon's cash position and reducing its Capital Impairment Ratio. If the Licensee realizes any settlement related to the Lids lawsuit, the entire proceeds will be directed to pay off the Licensee's existing SBA Debentures.

**SBA IS AN EQUAL OPPORTUNITY EMPLOYER AND PROVIDER**

Federal Recycling Program    Printed on Recycled Paper

Two originals of this Letter of Terms and Conditions are provided so that one may be retained by Marathon Investment Partners, L.P. and the other signed and returned to this Office, Attention: Mr. Kenneth B. Levy.

U.S. Small Business Administration

By: _____

Ronald Cibolski
Director, Office of SBIC Operations

Agreed and Accepted:

Marathon Investment Partners, L.P.

By: _____          June 26, 2002
    Signature                                              Date

_____
Print Name and Title



U.S. SMALL BUSINESS ADMINISTRATION
WASHINGTON, D.C. 20416

License No. 01/01-0370

**SENT BY FACSIMILE AND MAIL**

MAY 2 5 2004

Mr. Paul Bolger, Managing Director
Marathon Investment Partners, LP
500 Edgewater Drive, Suite 555
Wakefield, Massachusetts  01880

Dear Mr. Bolger:

As of March 31, 2004, the Licensee's Capital Impairment ("Impairment"), as defined by Section 107.1830 of the regulations, totaled 89.80 percent.  The Licensee's permissible Impairment is 45 percent based upon its level of equity investments and its ratio of outstanding leverage to Leverageable Capital.

As the Licensee is aware, subsequent to a portfolio review meeting on May 7, 2002, SBA and the Licensee entered into a Letter of Terms and Conditions ("Letter") dated June 19, 2002.  The Letter provided the terms and conditions under which the current management would continue to operate the Licensee in a manner that would result in the timely liquidation of the remaining portfolio.  The Letter provided that:

    1.  The Licensee would not engage in new investments and make only follow-on investments with the prior approval of the SBA.

    2.  The Licensee would reduce its overhead and reduce its management and advisory fee to $500,000.

    3.  The entire proceeds from the realization of any settlement related to the Lids lawsuit would be applied toward the pay off of the Licensee's existing SBA debentures.

SBA acknowledges the Licensee's compliance with requirements 1. and 2. above.  The Licensee, however, did not receive any proceeds resulting from the settlement of the Lids lawsuit.

A follow-up portfolio meeting was held between SBA and the Licensee's management on August 27, 2003.  As a result of that meeting it was determined that: (1) the Licensee's anticipated portfolio exits should provide for repayment of SBA's outstanding debenture leverage; (2) the Licensee had sufficient liquidity without additional SBA leverage; and (3) the Licensee would be allowed to continue to operate under the Letter.  The Licensee was also informed that SBA would reconsider its position if, upon receipt of the Licensee's March 31, 2004, quarterly SBA Form 468, Short Form ("Form 468"), there were no reported liquidity events or the Licensee experienced additional write-offs and realized losses.

SBA IS AN EQUAL OPPORTUNITY EMPLOYER AND PROVIDER

Federal Recycling Program  Printed on Recycled Paper

Review of the Form 468 indicates that: (1) the Licensee's impairment is 89.80 percent; and (2) there are no reported liquidity events. Therefore, SBA hereby notifies Marathon Investment Partners, L.P. that it is in default under the terms of its debentures issued from April 16, 1999, through October 26, 2000, pursuant to §107.1810(f)(5) of the Code of Federal Regulations. The details are as shown below:

| Loan No. | Disbursement Dates | Maturity Dates 9/1/99 to 3/28/11 | Rates | Amount |
|----------|-------------------|-------------------|-------|--------|
| Various | Various | | Various | $14,450,000 |

The event of default is due to capital impairment of 89.80 percent as reported on the Form 468 as of March 31, 2004.

Pursuant to §107.1810(f)(5), SBA requires that Marathon Investment Partners, L.P. cure its impairment no later than 15 days from the date on this letter. In the event that the impairment is not cured by that date, SBA will recommend that Marathon Investment Partners, L.P. be transferred to our Office of SBIC Liquidation in order to protect the Agency's credit position.

SBA appreciates your continued cooperation and timeliness in keeping SBA informed regarding the status of the Licensee's financial position. The Licensee's understanding of the seriousness of the situation and cooperation in correcting its condition of Capital Impairment will be appreciated. Should you have any questions, please call me or Fonda Stephens-Kelly, Account Executive, on (202) 205-7591 or (202) 205-7596, respectively.

Sincerely,

Michael Donadieu
Acting Area Chief, Area III
Office of SBIC Operations

# Fax Cover Sheet

## www.sba.gov

U.S. Small Business Administration

# SBA

*Your Small Business Resource*

**To:** Paul Bolger

**Organization:** Marathon Investment Partners, Inc.

**Phone:** _____    **Fax:** 781 246-4698

**Date:** 9/2/2004    **Time:** 10:49 AM

**From:** Cecilia Hoppenjans

**Office:** SBIC Liquidation

**Phone:** 202 205-7250    **Fax:** 202 481-4268

**No. of pages (including this cover sheet)** 3

As America's Small Business Resource, the SBA can connect you with a network of services to fit your needs.

We help small businesses:

- Get funding to grow.
- Open doors to contracts.
- Find local resources.
- Recover from disasters.

And more.

---

**Message:**
Acceleration of Indebtedness and Demand for Payment

---

CONFIDENTIALITY NOTE: the information contained in this facsimile transmittal sheet and the document(s) that follow are for the exclusive use of the addressee and may contain information protected by the Privacy Act, 5 U.S.C. 552a, or otherwise confidential; privileged, on non-disclosable information. If the recipient of this facsimile is not the addressee or is not the person responsible for delivering this facsimile to the addressee, the recipient may violate the law by reading, photocopying, distributing or otherwise using this facsimile transmission or its contents in any way. If the recipient has received this facsimile transmission in error, call the sending office immediately.

SBA Form 959 (03/04) Previous editions are obsolete.

Federal Recycling Program   Printed on Recycled Paper



**U. S. SMALL BUSINESS ADMINISTRATION**
409 3RD STREET, S.W., SUITE 6600
WASHINGTON, D.C. 20416
TELEPHONE: (202) 205-7250    FACSIMILE: (202) 205-6959

INVESTMENT
DIVISION
(202)205-6500
OFFICE OF
LIQUIDATION

September 2, 2004

**Certified Mail and Facsimile (781) 246-4698**
Marathon Investment Partners, Inc.
500 Edgewater Drive
Suite 555
Wakefield, MA 01880
Attn: Paul Bolger

License No. 01/01-0370

    Re: Acceleration of Indebtedness
       Demand for Payment

Dear Mr. Bolger:

Pursuant to the Small Business Investment Act of 1958, as amended (the "SBIA"), the Small Business Administration (SBA) provided financing to Marathon Investment Partners, Inc. (Licensee), through purchase from the Licensee of the following subordinated debentures ("the Debentures"):

| Loan Number | Face Amount | Daily Per Diem (Including 1% Fee) | Interest | Fee |
|---|---|---|---|---|
| 04658051-04 | $2,500,000.00 | $563.01 | $90,991.78 | $12,602.74 |
| 04658052-02 | 2,250,000.00 | 506.71 | 81,892.60 | 11,342.47 |
| 04658053-00 | 500,000.00 | 112.60 | 18,198.36 | 2,520.55 |
| 04658054-09 | 750,000.00 | 168.90 | 27,297.53 | 3,780.82 |
| 04658055-07 | 750,000.00 | 168.90 | 27,297.53 | 3,780.82 |
| 04658056-05 | 750,000.00 | 168.90 | 27,297.53 | 3,780.82 |
| 04658057-03 | 600,000.00 | 142.03 | 23,108.38 | 3,024.66 |
| 04658058-01 | 500,000.00 | 118.36 | 19,256.99 | 2,520.55 |
| 04658059-10 | 500,000.00 | 118.36 | 19,256.99 | 2,520.55 |
| 04658060-02 | 500,000.00 | 118.36 | 19,256.99 | 2,520.55 |
| 04658061-00 | 500,000.00 | 118.36 | 19,256.99 | 2,520.55 |
| 04658062-09 | 400,000.00 | 94.68 | 15,405.59 | 2,016.44 |
| 04658063-07 | 2,000,000.00 | 463.12 | 75,132.49 | 10,082.19 |
| 04658064-05 | 100,000.00 | 23.16 | 3,756.62 | 504.11 |
| 04658065-03 | 750,000.00 | 173.67 | 28,174.68 | 3,780.82 |
| 04658066-01 | 350,000.00 | 70.51 | 11,209.13 | 1,764.38 |
| 04658067-10 | 750,000.00 | 151.09 | 24,019.56 | 3780.82 |
| **Total** | **$14,450,000.00** | **$3,280.72** | **$530,809.74** | **$72,843.84** |

The Debentures incorporate, by reference, provisions of SBA's Regulations (13 C.F.R.) ("the Regulations") as if fully set forth therein, including, but not limited to, 107.1810, <u>Events of default and SBA's remedies for Licensee's non-compliance with the terms of Debentures</u>. Section 107.1810(g) of the Regulations provides, in part, that upon written notice to the Licensee of one or more of the events in paragraph (f) of Section 1810, and subject to the conditions of paragraph (g)(2) of Section 1810, SBA (1) may declare the entire indebtedness evidenced by Licensee's debentures, including accrued interest, and/or any other amounts owed SBA with respect to the Debentures, immediately due and payable; and (2) may avail itself of any remedy available under the Act, specifically including institution of proceedings for the appointment of SBA or its designee as receiver under Section 311(c) of the Act.

**SBA has determined that the Licensee has violated the following sections of the Regulations:**

**Section 107.1810 (f) (5) Capital Impairment**

By letter dated March 25, 2004, The Office of Operations gave the Licensee fifteen (15) days from that date to cure its impairment. The capital impairment was not cured within the time period specified, and per the Form 468 submitted to SBA as of 6/30/04, capital impairment has increased to 111%. Therefore, SBA has determined that the Licensee has violated Section 107.1810(f)(5), Capital Impairment.

You should be advised that the Licensee's account has been transferred to liquidation status and the Debentures are hereby accelerated. Your remittance of payment in full for the accelerated Debentures, including accumulated interest and fees thereon, should be submitted to the undersigned before the expiration of fifteen (15) days from the date of this letter. As of September 1, 2004 the Licensee is indebted to SBA upon the Debentures in the total principal amount of $14,450,000.00 plus accrued interest and fees through the next semi-annual due date of September 1, 2004 of $530,809.74 and fees of $72,843.84, totaling $603,653.58. The per diem rate on all of the debentures, all of which will be purchased by the SBA is $3,280.72.

No right or cause of action of SBA shall be waived by this notice of acceleration of maturity and demand for payment. In the absence of satisfactory payment to the foregoing within the time specified, please be advised that this Agency will commence appropriate legal action for the collection of this indebtedness.

Sincerely,

M. Cecilia Hoppenjans, CPA
Financial Analyst, Account Resolution Branch
Office of SBIC Liquidation


cc:     Office of General Counsel
        Gail Green, Chief, Account Resolution Branch



U. S. SMALL BUSINESS ADMINISTRATION
409 3RD STREET, S.W., SUITE 6600
WASHINGTON, D.C. 20416
TELEPHONE: (202) 205-7250    FACSIMILE: (202) 481-4265

INVESTMENT
DIVISION
(202)205-6500
OFFICE OF SBIC
LIQUIDATION

December 8, 2004

Marathon Investment Partners, LP
Mr. Thomas F. Lee
Mr. Clifford L. Lusso
50 Edgewater Drive
Suite 555
Wakefield, MA  01880

　　　　Re:　　Letter of December 2, 2004

Dear Messrs. Lee & Lusso:

This letter is the response of the United States Small Administration ('SBA") to your letter dated December 2, 2004.  Contrary to the statements in your letter, SBA has been willing to entertain any and all offers from Marathon and has made itself available to Marathon at all times.

As you will recall from the meeting held on September 10, 2004, SBA's priority was first to resolve the issue as to payment of the unfunded commitments outstanding.  Prior to (and subsequent to) the meeting, Marathon refused to call in, under any circumstances, the unfunded commitments of its limited partners.  As SBA has previously and repeatedly discussed with you, any offer in which SBA is not paid in full cannot be accepted without the assurance that the unfunded commitments will be called.  No matter what offer Marathon brings to the table, short of payment in full for SBA, the unfunded commitments are a legal obligation that must be met.  Marathon's response to SBA's justifiable concern was an electronic message dated September 20, 2004 stating "We are not willing to call the Unfunded Commitments."  That response is both unacceptable as it appears that Marathon's general partner is putting the interests of the various limited partners ahead of the interests of the SBIC and its creditors, including SBA.  Marathon's SBIC license was granted based upon reliance on the fact that these commitments would be paid.

Moreover, I would like to clarify one point on which Marathon seems mistakenly fixated: the position of the Office of SBIC Liquidation has always been that all unfunded commitments are to be pursued and collected.  While SBA may entertain varying forms and methods of repayment from the unfunded entities, depending upon the receivership's operating needs, full recovery of unfunded commitments has always been, and will continue to be, a priority for this Office.

As you are aware, Marathon is severely capitally impaired. Due to Marathon's capital impairment and the matters discussed in this letter, SBA will be filing court pleadings requesting



U. S. SMALL BUSINESS ADMINISTRATION
409 3RD STREET, S.W., SUITE 6600
WASHINGTON, D.C. 20416
TELEPHONE: (202) 205-7250     FACSIMILE: (202) 481-44268

INVESTMENT
DIVISION
(202)205-6500
OFFICE OF SBIC
LIQUIDATION

January 3, 2005

By FACSIMILE 781 246-4698
Marathon Investment Partners, LP
Mr. Thomas F. Lee
Mr. Clifford L. Lusso
50 Edgewater Drive
Suite 555
Wakefield, MA 01880

     Re:   Letter of December 16, 2004

Dear Messrs. Lee & Lusso:

This letter is the response of the United States Small Administration ('SBA") to your letter dated December 16, 2004.

To reiterate my last letter, in our initial meeting held on September 10, 2004, SBA's priority was first to resolve the issue as to payment of the unfunded commitments outstanding. This continues to be one of SBA's priorities. Your December 16th proposal Marathon is merely offering to:

1) Pay for an independent valuation report on the remaining Marathon assets,
2) Possibly have some or all of the Limited Partners pay a premium above the valuation report present value of the assets, with the request that any premiums be applied towards the unfunded commitment balance, and
3) Have the remainder of the unfunded commitment paid as the SBIC's investments are liquidated over a 24 month period.

Marathon does not appear to understand that the unfunded commitments are a legal obligation to the SBIC which exist whether or not some or all of the Limited Partners agree to pay a premium on some of the assets, and regardless as to the timing of the liquidation of the assets. SBA relied upon the commitment amount when the SBIC's license was granted and will agree to no less than the committed amount.

We appreciate your concern for the well being of the portfolio companies; however, SBA has handled numerous receiverships and has proven success providing positive returns from debenture SBIC assets.

Marathon continues to be severely capitally impaired. Due to Marathon's capital impairment and the outstanding unfunded commitment balance, **without the written confirmation by Marathon that it will call and pursue the collection of the full unfunded commitment amount, and receipt of the signed and executed consent receivership pleadings (forwarded to you previously) both to SBA by no later than January 10, 2005, SBA will proceed to file an adversarial complaint and motion for receivership.**

In the future, all correspondence should be handled through your attorney directly to the attorney assigned to this case, Arlene Embrey.  Her phone number is (202) 205-6976.

Sincerely,

M. Cecilia Hoppenjans, CPA
Financial Analyst
Office of SBIC Liquidation

cc:     Thomas G. Morris, Director, O/L
        Gail Green, O/L
        Arlene M. Embrey, Trial Attorney, OGC
        Michael Haynes, Esq.



**SAUGATUCK CAPITAL COMPANY**
LIMITED PARTNERSHIPS

March 4, 2005

Mr. Clifford J. Lusso
Director
Marathon Investment Partners LP
500 Edgewater Drive
Suite 555
Wakefield, MA 01880

Dear Cliff:

After our conversation, Tom and I discussed your situation and we are interested in making an offer to purchase the remaining investments of Marathon Investment Partners LP. In order to provide you with a meaningful offer, we would need detailed information on the remaining investments. We will sign an agreement to keep the information confidential, since we understand your need to do so.

Please cal me at (203) 348-6669 to discuss the next steps.

Sincerely,

John J. Geisler
Managing Director

JJG:amw
cc: Thomas J. Berardino